IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TENEACE JOHNSON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION 11-0221-WS-M |
| ) | |
| TMI MANAGEMENT SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter comes before the Court for award of damages and entry of default judgment against defendant, TMI Management Systems, Inc.

**I.    Procedural Posture of the Case.**

Plaintiffs, Teneace Johnson and Teresa Johnson, brought this action against defendant, TMI Management Systems, Inc. ("TMI"), alleging employment discrimination on the basis of race and gender, as well as retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended, and 42 U.S.C. § 1981.  Although TMI initially appeared and defended against the Johnsons' claims, TMI abruptly ceased all efforts to participate in this action late in 2011.  Defendant's counsel of record requested and received leave to withdraw, after which TMI failed to comply with multiple orders from Magistrate Judge Milling requiring it to retain new counsel to represent it herein.  Although it has received multiple opportunities and invitations to do so, TMI has made no discernible effort to appear or defend in this action since January 2012.

In light of these facts and circumstances, the Clerk of Court entered a Clerk's Entry of Default (doc. 32) against TMI on March 1, 2012.  TMI was given notice of the default, yet it did nothing.  When defendant continued to ignore these proceedings, the undersigned entered an Order (doc. 34) granting plaintiffs' Motion for Default Judgment on April 18, 2012.  All that remained was for the Court to fix damages, inasmuch as even in the default judgment context, "[a] court has an obligation to assure that there is a legitimate basis for any damages award it enters." *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see also Virgin*

*Records America, Inc. v. Lacey*, 510 F. Supp.2d 588, 593 n.5 (S.D. Ala. 2007) ("plaintiffs' allegations relating to the amount of damages are not admitted by virtue of default; rather, the court must determine both the amount and character of damages").

To prove up their damages in this case, plaintiffs filed a supplemental evidentiary submission and memorandum (doc. 37) on July 18, 2012, plus additional affidavits (doc. 38) on August 1, 2012.  Also, the Court held an evidentiary hearing on damages on July 25, 2012, at which time both plaintiffs testified as to their emotional distress, mental anguish, and other nonpecuniary compensatory damages.  After careful consideration of all of this evidence, as well as the materials appended to plaintiffs' initial Motion for Default Judgment (doc. 33), the Court now makes the necessary factual and legal determinations for each category of damages as to which plaintiffs seek an award.

**II.    Damages Award.**

The record is clear that the only remedies plaintiffs are seeking consist of back pay, compensatory damages for nonpecuniary losses, and punitive damages.[1]  The Court will examine the statutory provisions governing these kinds of damages, then enter findings of fact and conclusions of law as to plaintiffs' claims for each such category.

   *A.    Statutory Backdrop.*

With regard to back pay, the statute provides that, where an employer engages in an unlawful employment practice, the award may include "back pay (payable by the employer … responsible for the unlawful employment practice)," but that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5(g)(1).  By statute, a prevailing plaintiff may also be awarded compensatory damages (not including back pay or interest on back pay) for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses."  42 U.S.C. § 1981a(b)(3).  And a Title VII plaintiff may also "recover punitive damages … if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory

---

[1] In various pleadings and prior submissions, plaintiffs had previously suggested that they were also seeking declaratory and injunctive relief.  At the July 25 hearing, however, plaintiffs' counsel confirmed that damages and attorney's fees are the sole remedies they are now requesting in this action.

practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).  The latter two categories of damages (compensatory damages other than back pay, and punitive damages) are subject to a combined statutory cap of $300,000 per plaintiff.  *See* 42 U.S.C. § 1981a(b)(3)(D).[2]

This statutory language informs the Court's findings as to the Johnsons' entitlement to back pay, compensatory damages and punitive damages in this action.

### B. Back Pay.

"Successful Title VII claimants … are presumptively entitled to back pay." *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 794 (11th Cir. 1999).  "Back pay is the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained." *Akouri v. State of Florida Dep't of Transp.*, 408 F.3d 1338, 1342 (11th Cir. 2005) (citation omitted). "Generally, a Title VII plaintiff can recover back pay only for the period the plaintiff is available and willing to accept substantially equivalent employment elsewhere; courts exclude periods where a plaintiff is unavailable to work … from the back pay award." *Lathem*, 172 F.3d at 794. Pursuant to the plain language of § 2000e-5(g)(1), amounts earned or reasonably earnable by a plaintiff mitigate, and must be offset from, her back pay award.[3]

---

[2] The amount of the statutory cap is a sliding scale ranging from $50,000 on the low end to $300,000 on the high end, depending on how many employees the defendant has.  *See* § 1981a(b)(3)(A)-(D).  The $300,000 limit applies if the defendant "has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year." *Id.* As part of their evidentiary submission in the default judgment proceedings, the Johnsons show that TMI employed approximately 644 employees during the relevant time period, based on information provided by defendant to the EEOC in August 2010.  (Doc. 37, Exh. 1.)  In light of that showing, and plaintiffs' inability to obtain further details from TMI through the discovery process because of defendant's defaulted status, the Court finds that the $300,000 statutory cap on nonpecuniary compensatory and punitive damages is applicable here, rather than a lesser amount corresponding to defendants with fewer than 500 employees.

[3] That said, unemployment compensation benefits are not deducted from allowable back pay awards.  *See Dominguez v. Tom James Co.*, 113 F.3d 1188, 1191 (11th Cir. 1997) (reaffirming prior holding that "unemployment compensation benefits should not be deducted from Title VII back pay awards"); *Blount v. Blue Cross and Blue Shield of Florida, Inc.*, 2011 WL 672450, *1 (M.D. Fla. Feb. 17, 2011) ("the Eleventh Circuit has held unemployment compensation benefits should not be deducted from Title VII back pay awards").  Therefore, the fact that both plaintiffs received unemployment compensation benefits for some period of time after TMI fired them has no bearing on their back pay calculations.

In this Circuit, the appropriate calculation methodology for back pay awards in a Title VII case calls for computation on a quarter-by-quarter basis, as follows: "Loss of pay shall be determined by deducting from a sum equal to that which [the employee] would normally have earned for each such quarter or portion thereof, [her] net earnings, if any, in other employment during that period.  Earnings in one particular quarter shall have no effect upon the back-pay liability for any other quarter." *Kendrick v. Jefferson County Bd. of Educ.*, 13 F.3d 1510, 1512 (11th Cir. 1994) (citation omitted).  Each quarter's back pay figure may then be adjusted in the court's discretion to allow for prejudgment interest at the rate specified by the National Labor Relations Board ("NLRB").  *See E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1512 (11th Cir. 1987) (following NLRB guidance and determining that IRS prime rate should be used to calculate prejudgment interest on back pay awards in Title VII cases); *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp.2d 1303, 1318 (S.D. Fla. 2004) ("The NLRA method is to use the adjusted federal rate established by the IRS ….  An award of interest should therefore be calculated [in a Title VII case] based on the IRS prime rates that prevailed during the relevant period.").  That rate was 4% from April 1, 2009 through December 31, 2010; 3% from January 1, 2011 through March 31, 2011; 4% from April 1, 2011 through September 30, 2011; and 3% from October 1, 2011 through September 30, 2012.[4]

Teresa Johnson seeks back pay for the period of January 28, 2010 (the date on which TMI discharged her in violation of Title VII) through the present.  Her evidence shows that, in the absence of unlawful discrimination, she would have been working 40 hours per week for TMI as a material handler, earning $11.22 per hour ($448.80 per week, or $5,834.40 per quarter).  (Doc. 38, Exh. 1, ¶¶ 2-4.)  Offset from those amounts are the wages Teresa Johnson actually earned during this time period, which included $80.00 for one day's work in late 2010; $4,080.00 for temporary work she performed for the U.S. Census Bureau in the second quarter of 2011; $5,262.40 in wages earned in each of the third and fourth quarters of 2011 ($10.12 per hour at 40 hours per week and 13 weeks per quarter); and $5,621.20 in wages earned each quarter in 2012 ($10.81 per hour at 40 hours per week and 13 weeks per quarter).  After performing the necessary arithmetic, and adding in prejudgment interest at the rates specified by

---

[4]   These figures are derived from the NLRB's Operations-Management Memorandum OM 12-69 dated June 28, 2012.  *See* http://www.nlrb.gov/publications/operations-management-memos.

the NLRB, the Court finds that Teresa Johnson's total back pay award through today's date is **$32,835.19**.[5]

Teneace Johnson seeks back pay for the period of January 28, 2010 (the date on which TMI discharged her in violation of Title VII) through the present.  Her evidence shows that, in the absence of unlawful discrimination, she would have been working 40 hours per week for TMI as a material handler, earning $11.22 per week ($448.80 per week, or $5,834.40 per quarter). (Doc. 38, Exh. 2, ¶¶ 2-4.)  Offset from those amounts are the wages Teneace Johnson actually earned during this time period, which included $3,200.00 for temporary work she performed for the U.S. Department of Commerce in the second quarter of 2010 and $1,270.00 in monthly wages for Payne Elementary School from December 2011 through July 2012.[6]  After performing the necessary arithmetic, and adding in prejudgment interest at the rates specified by the NLRB, the Court finds that Teneace Johnson's total back pay award through today's date is **$46,494.36**.[7]

      C.      *Nonpecuniary Compensatory Damages.*

In addition to back pay, plaintiffs seek an award of nonpecuniary compensatory damages, to encompass emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other factors, as prescribed by 42 U.S.C. § 1981a(b)(3).  At the damages hearing conducted on July 25, 2012, the undersigned heard testimony from both Teresa Johnson and Teneace Johnson bearing on this category of damages.  In particular, Teresa Johnson testified as to how upset she was at having been passed over the material handler job in favor of less

---

[5] To reach this award, the Court adopts the $32,803.23 figure for principal plus interest through August 1, 2012, as calculated by plaintiffs at Exhibit A to Exhibit 1 of document 38.  To that amount, the Court adds $14.21 for back pay from August 2 through today's date, and $17.75 in interest through today's date.

[6] The Court notes that plaintiffs' initial damages submission omitted all of Teneace Johnson's wages earned at Payne Elementary School, artificially inflating the back pay calculation.  (*See* doc. 33, Exh. E.)  The revised version filed on August 1, 2012 appears accurate, however.

[7] To reach this award, the Court adopts the $46,083.63 figure for principal plus interest through August 1, 2012, as calculated by plaintiffs at Exhibit A to Exhibit 2 of document 38.  To that amount, the Court adds $384.69 for back pay from August 2 through today's date, and $26.04 in interest through today's date.

experienced white and/or male employees; that she felt embarrassed and hurt that TMI treated her "like she was nothing;" that she cried and was upset when TMI fired her; that she incurred stress and financial and emotional hardship because TMI had discharged her; and that it was difficult for her to obtain alternative employment because of unfavorable local economic conditions in Selma. Teneace Johnson's testimony at the hearing was quite similar, as she indicated that she was hurt and upset when TMI passed over her for material handler jobs in favor of less qualified white and/or male employees, that she cried when TMI fired her, that she had to borrow money from the bank and from family members to pay her bills, that she would sit home and cry because of the financial strain resulting from having been fired by TMI and being unable to find another job, and that she felt betrayed by TMI.

On the strength of this and other evidence presented at the July 25 damages hearing, and after careful analysis of the plaintiffs' testimony and demeanor, the Court finds that plaintiffs have made a showing that warrants an award of compensatory damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life they incurred because of TMI's Title VII and § 1981 violations. Based on this evidence, the Court awards the sum of **$50,000.00** each to Teresa Johnson and Teneace Johnson to compensate them for their emotional distress proximately caused by the wrongful conduct of TMI.

### D.    *Punitive Damages.*

The Johnsons also request an award of punitive damages. By statute, plaintiffs are eligible for an award of punitive damages only if they demonstrate that TMI "engaged in a discriminatory practice … with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In this context, "[m]alice means an intent to harm and recklessness means serious disregard for the consequences of one's actions." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 900 (11th Cir. 2011) (citation omitted). Moreover, punitive damages are available only if "the discriminating employee was high up the corporate hierarchy or … higher management countenanced or approved his behavior." *Id.* The Eleventh Circuit has explained that the types of conduct supporting a punitive damages award include "(1) a pattern of discrimination, (2) spite or malevolence, or (3) a blatant disregard for civil obligations." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1280 (11th Cir. 2008).

In support of their claim for punitive damages, the Johnsons do not suggest that the wrongful conduct culminating in their discharge was performed by or known to upper

management at TMI.[8]  They do not identify a pattern of discrimination, nor do they even allege that defendant was motivated by spite or malevolence.  Instead, plaintiffs rely heavily (and almost exclusively) on TMI's "no contact" policy, which required employees to certify as follows: "Should I have any questions regarding TMI Management Systems, Inc. issues I am to discuss said issues with TMI's onsite supervisor or other TMI Management Systems, Inc. Management Staff and not with government personnel.  I understand that failure to follow this policy could result in disciplinary action or even termination of my employment."  (Doc. 33, Exh. A at Exh. A.)

Plaintiffs characterize this policy as one "which made any complaint of discrimination a violation of company policy."  (Doc. 37, at 3.)  But such a sweeping generalization does not find support in the record.  Plaintiffs were not fired for reporting discrimination to the EEOC, and they offer no evidence that TMI would have viewed such conduct as a violation of the policy. Nor did TMI contend that plaintiffs violated the "no contact" policy by complaining of discrimination internally.  And plaintiffs do not maintain that their efforts to complain of unlawful discrimination (either within TMI or to the EEOC) were in any way impaired or stymied by the existence of TMI's "no contact" policy.  Rather, taking the well-pleaded allegations of the pleadings as true, TMI's position was that plaintiffs were fired for conferring with FEMA site manager Ron Parten about their dissatisfactions with TMI's employment decisions.  Contrary to plaintiffs' contentions, this "no contact" policy – whether on its face or as applied – does not evince malice or reckless indifference on the part of TMI to plaintiffs' rights to engage in protected activity under applicable provisions of Title VII and Section 1981.  The Court can readily envision many applications of this policy that would in no way implicate the

---

[8]  To be sure, plaintiffs suggest that the discriminatory agent, Tamara Todd, was TMI's "highest company official on the site."  (Doc. 37, at 4.)  But that information, without more, reveals nothing about Todd's stature in TMI's chain of command or corporate hierarchy. After all, plaintiffs' evidence also shows that TMI had hundreds of employees scattered across numerous sites, and that the Selma location where Todd was assigned employed less than 5% of TMI's 644 employees.  (Doc. 37, Exhs. 1 & 2.)  Considered in context, then, Todd's status as "highest company official on the site" simply cannot support a reasonable inference that Tamara Todd was "high up the corporate hierarchy," such that her discriminatory or retaliatory conduct towards the Johnsons would justify imposition of punitive damages against TMI.  And plaintiffs' assertion that TMI's upper management ratified Todd's conduct during the EEOC investigation is unpersuasive in the absence of evidence that such upper management actually knew of Todd's discriminatory and retaliatory motives.

statutory proscription on retaliation. Moreover, the circumstances of this case do not reflect that plaintiffs complained to Parten because they were not comfortable voicing their dissatisfactions internally (on the contrary, they did just that by complaining directly to Tamara Todd), or that the policy was or would have been construed by TMI to bar them from complaining to the EEOC.[9] In short, the "no contact" policy itself, considered in tandem with the totality of the facts in this case, does not reveal the kinds of circumstances that can support a finding of malice or reckless indifference by TMI.

For these reasons, the Court finds that plaintiffs have not met their burden of establishing a right to an award of punitive damages in this case pursuant to 42 U.S.C. § 1981a(b)(1). No punitive damages will be awarded.

### III. Conclusion.

For all of the foregoing reasons, it is **ordered** that default judgment will be entered in favor of plaintiff Teresa Johnson and against defendant TMI Management Systems, Inc. in the amount of $32,835.19 in back pay and $50,000.00 in nonpecuniary compensatory damages, for a total award of **$82,835.19**. It is further **ordered** that default judgment will be entered in favor of plaintiff Teneace Johnson and against defendant TMI Management Systems, Inc. in the amount of $46,494.36 in back pay and $50,000.00 in nonpecuniary compensatory damages, for a total award of **$96,494.36**. A separate judgment will enter.

Any petition for attorney's fees that plaintiffs may wish to present must be filed on or before **August 28, 2012**. The petition must include as exhibits detailed records showing the hours, tasks, and hourly rates claimed by plaintiffs' counsel, and must also include a memorandum of law explaining why plaintiffs believe those fees are reasonable under applicable law in the factual, legal and procedural context of this case.

---

[9] It must be remembered that FEMA appears, for all intents and purposes, to have been TMI's customer. The Court is hard-pressed to understand how it could be malicious or recklessly indifferent to employees' federally protected rights for an employer to restrict employees from discussing the employer's business or personnel grievances with its customer. By all appearances, it is entirely reasonable (and not malicious or recklessly indifferent to employees' federal civil rights) for an employer not to want employees to air dirty laundry to a client. Perhaps if the company had a practice of interpreting that policy broadly to squelch a broad range of protected activity, plaintiffs would have a point. But no such evidence has been presented here.

-9-

DONE and ORDERED this 7th day of August, 2012.

                                          s/ WILLIAM H. STEELE
                                          CHIEF UNITED STATES DISTRICT JUDGE